PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3104
_____

BRITTAN HOLLAND, individually and on behalf of
all others similarly situated; LEXINGTON NATIONAL
INSURANCE CORPORATION,

Appellants

v.

KELLY ROSEN, Pretrial Services Team Leader;
MARY COLALILLO, Camden County Prosecutor;
CHRISTOPHER S. PORRINO, Attorney General of
New Jersey

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-17-cv-04317)
District Judge: Honorable Jerome B. Simandle

_____

Argued February 21, 2018

Before: AMBRO, RESTREPO,
and FUENTES, Circuit Judges

(Opinion filed: July 9, 2018)

Paul D. Clement, Esquire          (Argued)
Robert M. Bernstein, Esquire
Edmund G. LaCour, Jr., Esquire
Andrew C. Lawrence, Esquire
Michael F. Williams, Esquire
Kirkland & Ellis
655 15th Street, N.W.
Washington, DC  20005

Justin T. Quinn, Esquire
Robinson Miller
One Newark Center, 19th Floor
Newark, NJ   07102

       Counsel for Appellants

Christopher S. Porrino
   Attorney General of New Jersey
Stuart M. Feinblatt, Esquire          (Argued)
Christopher J. Riggs, Esquire
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ  08625

       Counsel for Appellees

Alexander R. Shalom, Esquire     (Argued)
Tess Borden, Esquire
Edward Barocas, Esquire
Jeanne LoCicero, Esquire

American Civil Liberties Union of New Jersey Foundation
89 Market Street
P.O. Box 32159
Newark, NJ  07102

Alan E. Schoenfeld, Esquire
Ryan M. Chabot, Esquire
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY  10007

Seth P. Waxman, Esquire
David M. Lehn, Esquire
Tiffany R. Wright, Esquire
WilmerHale
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

      Counsel for Amici Appellees

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>

New Jersey's system of pretrial release has long relied on monetary bail to ensure the presence of an accused person at trial. *State v. Robinson*, 160 A.3d 1, 5 (N.J. 2017). But in 2017, following an amendment to its Constitution, the New Jersey Criminal Justice Reform Act took effect. It replaced New Jersey's former monetary bail system with a new

framework that prioritizes the use of non-monetary conditions of release over monetary bail to secure a criminal defendant's pretrial liberty.

Brittan Holland and Lexington National Insurance Corporation challenge this feature of the Reform Act as a violation of the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Fourth Amendment of the United States Constitution. They seek a preliminary injunction enjoining Kelly Rosen, the Team Leader for Pretrial Services in the Criminal Division of the Superior Court of New Jersey, Mary E. Colalillo, the Camden County Prosecutor, and Christopher S. Porrino, the Attorney General of New Jersey, and their agents (for convenience we refer to the named officials and their agents collectively as the "State"), "from taking any actions to enforce statutory provisions [of the Reform Act] . . . that allow imposition of severe restrictions on the pre-trial liberty of presumptively innocent criminal defendants without offering the option of monetary bail." Proposed Order of Plaintiffs Granting Motion for a Temporary Restraining Order and a Preliminary Injunction at 2, *Holland v. Rosen*, 277 F. Supp. 3d 707 (2017) (No. 17–4317).

After considering the standing of Holland and Lexington to bring suit, we conclude, as did the District Court (per Judge Simandle), that only the former may make the challenge here. On the merits, the question key to Holland's contentions is whether there is a federal constitutional right to deposit money or obtain a corporate surety bond to ensure a criminal defendant's future appearance in court as an equal alternative to non-monetary conditions of pretrial release. Our answer is no. Thus we affirm the District Court's comprehensive and well-reasoned ruling.

4

## I. Background

### A. New Jersey Pretrial Release and Detention Prior to the Criminal Justice Reform Act

Prior to the Reform Act, New Jersey's system of pretrial release relied heavily on the use of monetary bail, requiring defendants to post either cash or arrange with a third party a bond for their release. *Robinson*, 160 A.3d at 5; N.J. Att'y Gen. Law Enf't Dir. 2016–6, at 9 (2016) ("AG Dir. 2016–6"); Chief Justice Stuart Rabner *et al.*, Report of the Joint Committee on Criminal Justice 26 (2014) ("JCCJ Report"). Some defendants were released on personal recognizance (that is, undertaking a personal obligation to appear) or unsecured appearance bond (making a personal promise to pay, and sometimes obtaining a co-signor's promise to pay, a sum of money in the event of flight). *See State v. Rice*, 350 A.2d 95, 99 (N.J. Super. Ct. Law Div. 1975). For most, however, release on bail required the security of cash deposited with the court equal to the full amount of bail set, ten-percent cash bail, corporate surety bond, or property bond. JCCJ Report at 21–22. There was a presumption in favor of full cash bail for certain bail-restricted offenses. For most other offenses defendants were presumed to have a ten-percent cash bail option, *id.* at 22, which allowed them to deposit ten percent of the sum with the court and undertake a personal recognizance for the remainder. *State v. Moncrieffe*, 386 A.2d 886, 887 (N.J. Super. Ct. App. Div. 1978). Alternatively, defendants could post a corporate surety bond from an insurance company, which, after collecting a non-refundable fee from them and sometimes requiring collateral, executed a contract with the court and became responsible for the full amount of bail if the defendants failed to appear in court. JCCJ Report at 22. A final option was to post a property bond, for which defendants or their surety pledged real property, such as a deed to a

house. *Id.* The court in setting bail was only authorized to consider the risk of flight of defendants and was not authorized to consider any danger they may have presented. AG Dir. 2016–6, at 9; JCCJ Report at 19.

In 2012 two organizations—the Drug Policy Alliance and Luminosity—studied New Jersey's county jails and found that 73.3% of those held in custody were awaiting trial, and 38.5% of the total jail population had the option to post bail but were in custody due only to their inability to meet the terms of bail. Marie VanNostrand, New Jersey Jail Population Analysis 11, 13 (2013) ("VanNostrand Report"). One in eight inmates—12% of the total population—was in custody because he or she could not pay $2,500 or less.[1] *Id.* at 13. The median length of stay for pretrial detainees was 314 days. *Id.* at 12.

The State took steps to address these inequities. Governor Christie called in 2012 for a constitutional amendment to allow for pretrial detention in serious cases. *See* Office of the Courts, Criminal Justice Reform: Annual Report to the Governor & Legislature 1 (2016). And in 2013 Chief Justice Rabner established the Joint Committee on Criminal Justice, "comprised of judges, prosecutors, public defenders, private counsel, court administrators[,] and staff from the Legislature and [the] Governor's office." JCCJ Report at 1.

In a March 2014 report the Committee examined the consequences of the State's then-current bail system and recommended a major change to its approach. *Id.* In practice, the State's reliance on monetary bail resulted in the release of

---

[1] This statistic represents those defendants for whom bail was set at $250,000 or less, with the assumption they had a ten-percent cash bail option. *See* VanNostrand Report at 13.

defendants who could afford to pay for their release, even if they posed a substantial risk of flight or danger to others, and the pretrial detention of poorer defendants who presented minimal risk and were accused of less serious crimes. *Id.* at 1–2. The report, supported by extensive research, found significant consequences to pretrial custody: defendants detained in jail while awaiting trial pled guilty more often, were convicted more often, were sentenced to prison more often, and received harsher prison sentences, than those released before trial. *Id.* The Committee sought to promote defendants' liberty interests by shifting from a "resource-based" to a "risk-based" system of bail that relies heavily on release (with non-monetary conditions to address defendants' particular risks) rather than pretrial detention. *Id.* at 2–3. The Committee did not recommend the abolition of monetary bail, though it did expect that relying on particular, and often nuanced, conditions would result in monetary bail being set with far less frequency. *Id.* at 61.

The Legislature ultimately adopted a proposal to amend the State Constitution as follows:

> All persons shall, before conviction, be eligible for pretrial release. Pretrial release may be denied to a person if the court finds that no amount of monetary bail, non-monetary conditions of pretrial release, or combination of monetary bail and non-monetary conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process. It shall be lawful for the Legislature to establish by law procedures, terms, and conditions applicable to pretrial

7

release and the denial thereof authorized under
this provision.

N.J. Const. art. I, ¶ 11 (2017). The Legislature also drafted the Criminal Justice Reform Act to implement changes to the State's bail system and provide for more timely trials.[2] The Act, described in greater detail below, stemmed from the passage of the proposed constitutional amendment, which voters approved by a margin of 61.8% to 38.2% in November 2014. *See* Div. of Elections, Dep't of State, Official List: Public Question Results for 11/04/2014 General Election Public Question No. 1, at 1 (Dec. 2, 2014). Both the amendment and the Act took effect on January 1, 2017.

### B. The Reform Act

The Reform Act's three goals are "primarily [to] rely[] upon pretrial release by non-monetary means to reasonably assure an eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, [and] that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process."[3] N.J. Stat. Ann. § 2A:162–15 (2017). Importantly, the Act applies only to "eligible defendants"—those issued "a

---

[2] The speedy trial reforms are not implicated by this appeal. They can be found at N.J. Stat. Ann. § 2A:162–22 (2017).

[3] The Act presumes there is a reasonable assurance the eligible defendant will not obstruct or attempt to obstruct the criminal justice process unless the prosecutor provides the court with contrary information relevant to that risk. *Id.* § 2A:162–17(e). As such, it is mentioned below only generally and not with respect to Holland personally.

8

complaint-warrant . . . for an initial charge involving an indictable offense or a disorderly persons offense." *Id.* A defendant charged by a complaint-summons will be released from custody and is not subject to the Act. *Id.* § 2A:162–16(d)(1).

The Reform Act establishes a multi-step process the court must follow when deciding to release or detain an eligible defendant. First, he or she is temporarily detained to allow the Pretrial Services Program ("Pretrial Services") to prepare a Public Safety Assessment and recommendation for release conditions and for the court to issue a pretrial release decision. *Id.* § 2A:162–16(a).

The Public Safety Assessment model, developed by the Laura and John Arnold Foundation, considers nine factors to measure the risk an eligible defendant will fail to appear in court and the risk he or she will engage in new criminal activity while on release. *See* American Civil Liberties Union of New Jersey *et al.*, New Jersey Pretrial Justice Manual 7, 8 (2016) ("ACLU Pretrial Justice Manual"). The Assessment for each eligible defendant is based on relevant information gathered from his or her electronic court records. AG Dir. 2016–6, at 27. The eligible defendant's risks for failure to appear and for new criminal activity are graded on a scale of one to six, with six being the greatest risk. He or she may also be flagged for new violent criminal activity. *Id.* These scores map onto a Decision-Making Framework that recommends a pretrial monitoring level based on the intersection of failure to appear and new criminal activity scores, the new violent criminal activity flag (should there be one), and other factors. *Id.*; *see also* Pretrial Release Recommendation Decision Making Framework (DMF) (March 2018).

Level 1 recommends eligible defendants report once a month by phone. Level 2 recommends monthly telephonic

reporting, monthly in-person reporting, and some monitored conditions (*e.g.*, a curfew). Level 3 recommends weekly telephonic or in-person monitoring and monitored conditions. Level 3+ recommends all the same conditions as level 3 plus electronic monitoring and/or home detention. If release is not recommended, the matrix suggests the eligible defendant be detained pretrial or, if released, ordered to comply with level 3+ conditions. ACLU Pretrial Justice Manual at 10.

The eligible defendant's first appearance must occur no later than 48 hours after his or her commitment to jail, subject to certain exceptions. N.J. Stat. Ann. § 2A:162–16(b)(1). At the first appearance the court must make a pretrial release decision unless the prosecutor files a motion for detention, in which case it will hold a separate pretrial detention hearing. *Id.* §§ 2A:162–17, 2A:162–18(a)(1). In general, that hearing must occur no later than the eligible defendant's first appearance, or three working days from the date the motion for detention was filed, unless the eligible defendant or prosecutor seeks a continuance. *Id.* § 2A:162–19(d)(1).

Not all eligible defendants may be detained pretrial. Rather, a prosecutor may only move to detain an eligible defendant charged with certain crimes, and the court must find clear and convincing evidence that no condition, or combination of monetary and non-monetary conditions, of release can reasonably assure the Act's goals. *Id.* §§ 2A:162–15, 2A:162–18(a)(1), 2A:162–19(a), (e)(3).

At the pretrial detention hearing, the eligible defendant has the right to counsel and to have counsel appointed if he or she is financially unable to obtain representation. He or she is also afforded the opportunity to testify, present witnesses, cross-examine witnesses, and present information by proffer or otherwise. *Id.* § 2A:162–19(e)(1). The eligible defendant

10

may also subpoena and call the State's witnesses. ACLU Pretrial Justice Manual at 42. Rules concerning admissibility of evidence in criminal trials do not apply to this hearing. N.J. Stat. Ann. § 2A:162–19(e)(1). Further, the eligible defendant is entitled to significant discovery for the detention hearing, including that the prosecutor's office shall provide "any available preliminary law enforcement incident report concerning the offense and the affidavit of probable cause," along with all statements or reports relating to the affidavit, evidence the State relies on to establish probable cause at the hearing, and the risk factors that the State advances at the hearing. N.J. Ct. R. 3:4–2(c)(1) (2017). The prosecutor's office must also provide all exculpatory evidence. *Id.* If there is no indictment, the prosecutor must establish probable cause that the eligible defendant committed the predicate offense. N.J. Stat. Ann. § 2A:162–19(e)(2).

The court may take into account numerous factors to determine whether to detain the eligible defendant. They include, for example, the nature of the offense charged, the history and characteristics of the eligible defendant, the nature and seriousness of his or her risk of danger, and the release recommendation of Pretrial Services. *Id.* § 2A:162–20. If the court orders detention, it must include written findings of fact (along with a statement of the reasons for detention) and direct that the eligible defendant be afforded a reasonable opportunity for private consultation with counsel. *Id.* § 2A:162–21(a). An eligible defendant ordered detained is entitled to appeal that decision in an expedited manner. *Id.* § 2A:162–18(c). Additionally, the hearing may be reopened at any time before trial if the court finds information that was not known to the prosecutor or the eligible defendant at the time of the hearing and that has a material bearing on whether there are conditions of release that will reasonably assure the Act's goals. *Id.* § 2A:162–19(f).

11

If the court does not order detention, it must determine what release conditions, if any, should be imposed on the eligible defendant. *Id.* § 2A:162–18(d). It needs to consider all the circumstances, the Public Safety Assessment and recommendation for release conditions, plus any information provided by a prosecutor or the eligible defendant. *Id.* §§ 2A:162–16(b)(2), 2A:162–17(a). Based on this information, the court shall order him or her to be released on personal recognizance or on execution of an unsecured appearance bond if either option would reasonably assure the Act's goals. *Id.* §§ 2A:162–16(b)(2)(a), 2A:162–17(a). If not, the court may order him or her released on a non-monetary condition or combination of conditions, "with the condition or conditions being the least restrictive . . . that the court determines will reasonably assure" the Act's goals. *Id.* § 2A:162–16(b)(2)(b); *see also id.* § 2A:162–17(b). If none of the above will reasonably assure those goals, the court may order the eligible defendant released on monetary bail, other than unsecured appearance bond, to assure his or her appearance in court (but not to assure a person or the community's safety), or a combination of monetary bail and non-monetary conditions to assure the goals that apply. *Id.* §§ 2A:162–16(b)(2)(c), 2A:162–17(c)(1), (d)(1), 2A:162–18(a)(2).

The release conditions imposed may require, at the minimum, that the eligible defendant refrain from committing any offense during release, avoid all communication with an alleged victim of the crime, avoid communication with specified witnesses who may testify concerning the charged offense, and comply with "any one or more non-monetary conditions" in the statute. *Id.* § 2A:162–17(b)(1). These non-monetary conditions include that the eligible defendant:

(a) remain in the custody of a designated person . . . ;

12

(b) maintain employment, or, if unemployed, actively seek employment;

(c) maintain or commence an educational program;

(d) abide by specified restrictions on personal associations, place of abode, or travel;

(e) report on a regular basis to a designated law enforcement agency, or other agency, or pretrial services program;

(f) comply with a specified curfew;

(g) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(h) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance without a prescription . . . ;

(i) undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

(j) return to custody for specified hours following release for employment, schooling, or other limited purposes;

(k) be placed in a pretrial home supervision capacity with or without the use of an approved electronic monitoring device . . . ; or

(l) satisfy any other condition that is necessary to reasonably assure [the Act's goals].

*Id.* § 2A:162–17(b)(2). If the court orders conditions contrary to the Public Safety Assessment's recommendation, it must provide an explanation for its decision in the document that authorizes the eligible defendant's release. *Id.* § 2A:162–23(a)(2). Additionally, the State Superior Court may later review conditions of release on its own motion, or a motion by the prosecutor or the eligible defendant, alleging there has been a "material change in circumstance that justifies a change in conditions." N.J. Ct. R. 3:26–2(c)(2). Any review

13

of conditions under this rule must be decided within 30 days of the date the motion was filed and the judge may set new conditions of release on a finding that there has been a material change in circumstances. *Id.*

The State has released statistics on pretrial release and detention for the year following the Reform Act's implementation. In 2017 142,663 defendants were charged by either a complaint-warrant or a complaint-summons. Of those, 44,319 defendants were issued a complaint-warrant. Prosecutors filed 19,366 motions for pretrial detention, and courts ordered 8,043 eligible defendants detained. The pretrial detention rate for all eligible defendants was 18.1%, and the overall pretrial detention rate (considering complaint-warrants and complaint-summonses) was 5.6%. *See* Office of the Courts, Criminal Justice Reform: Annual Report to the Governor & Legislature 4 (2017) ("CJR Report 2017"). Pretrial monitoring level 3+ was ordered for 8.3% of eligible defendants. *See* Initial Release Decisions for Criminal Justice Reform Eligible Defendants (January 1 – December 31, 2017) ("Initial Release Decisions 2017"). Additionally, judges ordered only 44 eligible defendants to post monetary bail in 2017. Overall, the State's pretrial jail population was reduced by 20%. CJR Report 2017, at 4.

## C.    The Parties

Holland was arrested in April 2017 for his alleged involvement in a bar fight, and he was charged with second-degree aggravated assault. The Affidavit of Probable Cause in support of the criminal complaint noted Holland struck the victim in the face in the parking lot outside a bar, then continued to strike the victim in the head and face after he fell to the ground, causing serious bodily harm. Holland then fled the scene and was apprehended at his home with his clothing covered in fresh blood.

14

The Camden County Prosecutor's Office filed a motion for pretrial detention due to the severity of Holland's alleged offense and his prior conviction for simple assault. The Decision-Making Framework recommended pretrial detention in part because the Public Safety Assessment flagged Holland for a risk of new violent criminal activity. Represented by a Public Defender, Holland negotiated for level 3+ non-monetary pretrial release conditions in exchange for the prosecutor's withdrawal of the motion. He appeared in court and accepted the negotiated agreement, which included home detention and electronic monitoring, and he declined to proceed with a pretrial detention hearing. Holland is currently on pretrial release with conditions including home detention (except for employment) and electronic monitoring. He has not sought a judicial determination of his conditions of release or any modification of the agreed conditions.

Lexington is a Florida corporation based in Maryland. It operates through independent bail bondsmen who are licensed by the New Jersey Department of Banking and Insurance and registered with the Superior Court clerk. It primarily underwrites bail bonds and acts as a corporate surety of bail bonds.

### D.    Procedural History

Holland and Lexington filed a class action Complaint and a Motion for a Preliminary Injunction on June 14, 2017. The State then filed an opposition to the injunction motion, to which Holland and Lexington replied. The American Civil Liberties Union filed a motion for leave to appear as *amicus curiae* on behalf of itself and the ACLU of New Jersey, Drug Policy Alliance, Latino Action Network, and National Association for the Advancement of Colored People – New Jersey Conference. The District Court granted the request of the national ACLU, which then submitted a brief and

participated in oral argument in support of the State. The Court convened a preliminary injunction hearing; after hearing oral argument, it denied the motion.

First, the Court considered Holland and Lexington's standing to raise their claims. It held Holland has standing on his own (called first-party standing) because his alleged injury would be redressed by a favorable judicial decision. However, it held that Lexington lacks first-party and third-party standing, the latter allowing a litigant to assert in certain circumstances claims of other parties. The Court reached its conclusion about third-party standing after finding Lexington had sufficiently alleged injury, but even assuming it has a close relationship with criminal defendants, it did not sufficiently allege criminal defendants face obstacles to pursuing their own claims that only Lexington can address adequately. The Court did not opine on whether Lexington's alleged injury fell outside the "zone-of-interests" of the Eighth, Fourteenth, and Fourth Amendments.

Second, in response to the State's argument that the Court must abstain from interfering with Holland's ongoing state criminal prosecution per *Younger v. Harris*, 401 U.S. 37 (1971), it applied *Gerstein v. Pugh*, 420 U.S. 103 (1975) (narrowing the scope of *Younger* abstention), and held abstention is not warranted.

Third, the Court addressed the merits of Holland's motion for a preliminary injunction. It examined the history of the Eighth Amendment's Excessive Bail Clause and held the argument for the right to monetary bail was unlikely to succeed on the merits. The Court then reviewed the procedures provided by the Reform Act and concluded the statute did not violate procedural due process and, in any event, Holland waived the process available to him by agreeing to level 3+ conditions. It also held the statute's

16

subordination of monetary bail did not violate substantive due process because Holland did not present any grounds for finding an option to obtain monetary bail is a fundamental right or is implicit in the concept of ordered liberty. Finally, it held the conditions imposed on Holland were not an unreasonable search under the Fourth Amendment because the prosecutor had to show there was probable cause for his charged offense, and Holland waived the opportunity to have a full pretrial detention hearing.

The Court turned to the likelihood Holland will suffer irreparable harm. It held there was scant likelihood of that occurring if an injunction were denied because Holland's suggested harm was the deprivation of his constitutional right to the option, alongside non-monetary bail, of monetary bail, which would have required the Court to hold there was such a right. Moreover, it noted Holland still has the ability to seek a modification of his conditions of release in the New Jersey court.

The balance of harms weighed against granting the requested injunction. The Court noted that such an injunction mandating consideration of monetary bail risked reinstalling the system of financial requirements that previously relegated to pretrial detention those unable to meet modest monetary bail requirements. It found the harm to Holland of denying the injunction was minimal because, even if monetary bail were set for him, he would likely have to pay a non-refundable bail bond premium.

Finally, the Court determined the public interest disfavors an injunction. It found the reforms implemented by the State support the public interest, particularly in light of the well-documented shortcomings of the prior monetary bail system.

## II. Jurisdiction and Standard of Review

The District Court had federal question jurisdiction, 28 U.S.C. § 1331, and we have jurisdiction over final orders of the Court under 28 U.S.C. § 1291. We exercise plenary review over challenges to the constitutionality of statutes. *United States v. Pendleton*, 636 F.3d 78, 82 (3d Cir. 2011). With respect to the denial of a preliminary injunction, we review findings of fact for clear error, legal conclusions *de novo*, and the decision to grant or deny the injunction for an abuse of discretion. *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015).

A preliminary injunction "is an extraordinary remedy . . . which should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (citation omitted). We do not issue that relief "unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted) (emphasis omitted). That burden typically involves four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm to the applicant; (3) whether the denial of a preliminary injunction would injure the moving party more than the issuance of an injunction would harm the non-moving party; and (4) whether the grant of relief would serve the public interest. *Del. Strong Families*, 793 F.3d at 308.

The first two factors are prerequisites for a movant to prevail. *Cf. In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.)) (reasoning, in the analogous context of a stay pending appeal, the movant must demonstrate both of the first two factors). The former requires Holland to "demonstrate that [he] can win on the merits

(which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Because we hold Holland has not made that demonstration, we do not delve deeply into the second factor, which would require Holland to show "that [he] is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* Though Holland argues irreparable harm exists because he is "subjected to severe restrictions of liberty without being offered the constitutionally required alternative of monetary bail," Appellants' Br. at 51–52, we discern in the Eighth, Fourteenth, and Fourth Amendments no constitutional requirement of monetary bail on the same priority level as non-monetary bail. Hence Holland is unlikely to suffer irreparable harm absent a preliminary injunction. (And, as the District Court noted, he may seek to modify his conditions of release in the New Jersey court.)

As Holland has not made the threshold showing on both of the prerequisite factors, we do not consider and balance the third and fourth factors—"the possibility of harm to other interested persons from the grant or denial of the injunction[] and . . . the public interest." *Reilly*, 858 F.3d at 176 (citation omitted).

### III. Standing

Before we reach the constitutional questions raised in this appeal, we address the parties' standing. The State argues the District Court erred in holding Holland has first-party standing because he did not suffer an injury-in-fact and because his alleged injury is not redressable by a court. Lexington asserts the Court also erred in holding it lacks third-party standing because it has a common interest with criminal defendants and they face obstacles to appealing their pretrial release decisions.

For Holland to have standing, he must "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The parties do not contest that Holland's alleged injury is traceable to the State's conduct. Rather, the State raises three arguments contesting Holland's standing. It argues before us that Holland did not allege in his Complaint that the "unconstitutional process" injured him, but rather it was the imposition of non-monetary conditions of pretrial release without considering monetary bail as a non-subordinated option. Additionally, it contends that, even if monetary bail were considered alongside non-monetary release conditions, Holland would still be subject to restrictive conditions to address his risk to the community or other persons. Finally, it asserts Holland failed to carry the burden of demonstrating he has an injury-in-fact (*i.e.*, one that is real and particular to him, called in constitutional argot "concrete and particularized") in part because he opted out of the pretrial detention hearing.

Each of the State's arguments fails. First, the State reads Holland's Complaint too narrowly. His prayer for relief—a preliminary injunction against imposing "severe restrictions on . . . pre-trial liberty . . . without offering the option of non-excessive monetary bail"—could fairly be read to mean the State court must offer (or have the option to offer) monetary bail when setting release conditions. Second, even assuming the Act's process is unconstitutional, the District Court correctly determined that if monetary bail were required to be considered on equal footing with non-monetary release conditions, Holland's injury—the "unconstitutional process"—would be redressed regardless what release conditions would be imposed. *Cf. Stehney v. Perry*, 101 F.3d 925, 931 (3d Cir. 1996) (holding plaintiff's injury would be redressed by a new employment review). Third, if the Act's

process deprived Holland of a constitutional right, his injury would be both concrete and particularized even though he opted out of the hearing. Holland contends he did not have access to a constitutionally compliant process. If so, this affected him personally and in a real way by disallowing him the opportunity to have monetary bail set even if he had agreed to participate in the process provided.

Lexington does not challenge the District Court's holding that it lacks first-party standing, and instead argues on appeal that the Court erred in holding it lacks third-party standing. We have recognized the prudential doctrine of third-party standing, which, to repeat, allows in limited circumstances litigants to assert claims based on the rights of third parties. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 287–88 (3d Cir. 2002). It may be appropriate "if a course of conduct prevents a third-party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement." *Id.* at 288 (citation omitted) (quotation marks omitted). A plaintiff asserting a third-party claim needs to meet three conditions: "[(]1) the plaintiff must suffer injury; [(]2) the plaintiff and the third party must have a 'close relationship'; and [(]3) the third party must face some obstacles that prevent it from pursuing its own claims." *Id.* at 288–89. Lexington, as the plaintiff, asserts it satisfies each of these conditions: it suffered an injury because the Reform Act "all but eliminated" the use of monetary bail and bail bonds; it has a common interest with criminal defendants like Holland in courts considering monetary bail alongside restrictive release conditions; and criminal defendants subject to home detention and electronic monitoring face obstacles to pursuing litigation themselves because of the nature and cost of challenges to pretrial-release decisions.

The State does not challenge that Lexington has sufficiently alleged injury due to its loss of business by the Act's shift away from monetary bail. Even assuming this factor is met, Lexington fails to satisfy the second and third conditions required for third-party standing—it has no relationship, let alone a close relationship, with potential criminal defendant-customers. In *Kowalski v. Tesmer*, the Supreme Court considered whether a "future attorney-client relationship with as yet unascertained Michigan criminal defendants who will request, but be denied, the appointment of appellate counsel" based on the operation of a state statute met the "close relationship" factor. 543 U.S. 125, 130 (2004) (citation omitted) (quotation marks omitted). It held the hypothetical relationship was not a "close" one; indeed, "they have no relationship at all." *Id.* at 131. The closeness of Lexington's hypothetical relationship with potential customers closely mirrors that of attorneys with potential clients.

We also follow *Kowalski* to hold Lexington has not demonstrated that potential criminal defendant-customers face obstacles to pursuing their own claims. The attorneys in *Kowalski* argued indigent defendants are hindered in advancing their own constitutional rights because "unsophisticated, *pro se* criminal defendants could not satisfy the necessary procedural requirements, and, if they did, they would be unable to coherently advance the substance of their constitutional claim." *Id.* at 132. The Supreme Court rejected this "hypothesis" by pointing to examples of *pro se* criminal defendants challenging the denial of appellate counsel. *Id.* We similarly reject Lexington's hypothesis that criminal defendants under home detention and electronic monitoring face obstacles to pursuing litigation when Holland appears to have the unfettered ability to do so.

22

In this context, Holland has standing to bring his constitutional claims. Lexington does not.

## IV. Likelihood of Success on the Merits

Holland challenges the Reform Act on the ground there is a constitutional right to have the option of posting monetary bail to secure pretrial release.[4] We address the likelihood of success for each constitutional argument in turn.

### A.     Eighth Amendment

The Eighth Amendment to our Constitution provides in part that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. It applies to the State of New Jersey through the Fourteenth Amendment. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (internal citation omitted); *Sistrunk v. Lyons*, 646 F.2d 64, 66 (3d Cir. 1981). Though there persists a rigorous debate whether the Excessive Bail Clause incorporates a "right to bail" inherent in its proscription of excessive bail, that is not the question we answer today. Even assuming the Eighth Amendment provides a "right to bail," we must determine whether that right requires *monetary* bail (*i.e.*, cash bail or a corporate

---

[4] We understand "monetary bail," as Holland uses the term, to refer to only cash bail and corporate surety bonds, Appellants' Br. at 1, 2, 6, 15–16, because he does not mention or allude to property bonds and because the Reform Act retains unsecured appearance bonds (also a form of monetary bail) for those eligible defendants who pose little risk of flight and danger. *See* N.J. Stat. Ann. §§ 2A:162–16(b)(2)(a), 2A:162–17(a); *see also Rice*, 350 A.2d at 99.

surety bond) to be considered in line with non-monetary release conditions.

At time of the Constitution, "bail" in criminal cases relied on personal sureties—a criminal defendant was delivered into the custody of his surety,[5] who provided a pledge to guarantee the defendant's appearance at trial and, in the event of nonappearance, a sum of money.[6] Anthony Highmore, *A Digest of the Doctrine of Bail; In Civil and Criminal Cases*, v–vi, 197 (1783). In the English tradition of bail that influenced early American practice, the pledge did not require any upfront payment to secure the conditional promise to pay, and producing the defendant for trial voided any later-arising obligation to pay. June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 520–21 (1983); F.E. Devine, *Commercial Bail Bonding* 5 (1991) (citing William Blackstone, *Commentaries on the Laws of England* 340–42 (Chitty Ed. 1857)); *see also* Lord

_____

[5] A defendant in a surety's custody is not physically confined by him; rather, the surety is legally responsible for producing the defendant at trial. *See* Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 746–47 (1996).

[6] In his Commentaries, William Blackstone mentions defendants sometimes giving a pledge on their own behalf in criminal cases (akin to what is now known as an unsecured appearance bond), but it appears this practice was less common as compared to personal suretyship. F.E. Devine, *Commercial Bail Bonding* 4 (1991) (citing William Blackstone, *Commentaries on the Laws of England* 297 (Chitty Ed. 1857)).

Edward Coke, *A Treatise of Bail and Mainprize* (1635), *reprinted in* Lord Edward Coke & William Hawkins, *Three Law Tracts* 279 (1764) (explaining "bail" derived from the French word *bailer*, meaning "to deliver," "because he that is bailed, is as it were delivered into the hands and custody of those that are his pledges and sureties."). Additionally, unlike corporate sureties of today, personal sureties did not receive any compensation for making a pledge on behalf of the criminal defendant. Devine at 6–7; Peggy M. Tobolowsky & James F. Quinn, *Pretrial Release in the 1990s: Texas Takes Another Look at Nonfinancial Release Conditions*, 19 New Eng. J. on Crim. & Civ. Confinement 267, 274 (1993).

The early adoption of a personal surety system is reflected in a number of American colonies' laws. New Jersey's colonial predecessor, for example, provided "[t]hat all persons arrested shall be bailable by sufficient sureties, unless for capital offences, where the proof is evident or presumption great." Aaron Leaming & Jacob Spicer, *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 235 (2d ed. 1881); *see also Sistrunk*, 646 F.2d at 68 n.13. It is in this context numerous colonies prohibited excessive bail. *See, e.g.*, *Cobb v. Aytch*, 643 F.2d 946, 958–60 n.7 (3d Cir. 1981) (en banc) (citing Virginia Bill of Rights § 9 (1776); Massachusetts Bill of Rights art. XXVI (1780)).

Prior to the ratification of the United States Constitution, the Northwest Ordinance created a federal statutory right to bail that replicated that of New Jersey. *See* Northwest Ordinance, 1 Stat. at Large 52, art. 2 (1787) ("All persons shall be bailable, unless for capital offences where the proof shall be evident or the presumption great."). After its ratification, the Judiciary Act of 1789 did largely the same. *See* Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 ("[B]ail

25

shall be admitted, except where the punishment may be death . . . .").

By contrast, the Constitution's Bill of Rights, through the Eighth Amendment, prohibited excessive bail. The Amendment was taken, with minimal alteration, from the English Bill of Rights of 1689. In England that clause was not thought to afford a right to bail in all cases, "but merely to provide that bail shall not be excessive in those cases where it is proper to grant bail." *United States v. Perry*, 788 F.2d 100, 111 (3d Cir. 1986) (quoting *Carlson v. Landon*, 342 U.S. 524, 545 (1952)); *see also* Bill of Rights, 1 W. & M. st. 2, c. 2, preamble, cl. 10 (1689). In a similar vein, many states' constitutions, including that of New Jersey, separately guaranteed bail by sufficient sureties for non-capital offenses and prohibited excessive bail.[7] N.J Const. of 1844, art. I, ¶¶ 10, 15 (1844); *see also* Caleb Foote, *Coming Constitutional Crisis in Bail*, 113 U. Pa. L. Rev. 959, 975 (1965).

In the context of the early personal surety bail system, the Eighth Amendment prohibited the demand that a surety pledge an excessive sum of money to secure the defendant's release. *See United States v. Burr*, 25 F. Cas. 55, 62 (Va. Cir. Ct. 1807). Thus personal surety bail may be characterized as a form of monetary bail, in that the surety agreed to pay a sum of money if the defendant failed to appear. But Holland does not argue the Amendment provides a right to personal surety bail; rather, he asserts the Amendment provides a right to pretrial release secured by cash bail or corporate surety bond.

---

[7] As in England, courts sometimes allowed defendants to make a pledge on their own behalf (alone or with third parties as co-signors). *See Respublica v. Burns*, 1 Yeates 370, 370 (Pa. 1794).

He has not shown, however, that "bail" at the time of the Constitution's ratification contemplated either of these two forms of monetary bail, and we find no evidence that they were in practice at that time. Hence, even if the Eighth Amendment provides a "right to bail," we do not construe its original meaning to include a right to make a cash deposit or to obtain a corporate surety bond to secure pretrial release.

Contemporary definitions of "bail" reflect its early form and a broader meaning that has taken hold over time. "Bail," in the criminal justice context, is defined variously as: (1) "the custody of a prisoner or one under arrest by one who procures the release of the prisoner or arrested individual by giving surety for his due appearance;" (2) "the security or obligation given for the due appearance of a prisoner in order to obtain his release from imprisonment;" (3) "the temporary delivery or release of a prisoner upon security for his due appearance;" (4) "one that agrees to assume legal liability for a money forfeit or damages if a prisoner released on bail fails to make his due appearance in court;" and (5) "the process by which a person is released from custody." *Bail*, Webster's Third New Int'l Dictionary 163 (1971). The last iteration is how we often think of bail colloquially: a means of achieving pretrial release from custody conditioned on adequate assurances.

The Supreme Court's use of "bail" since the middle of the Twentieth Century points to this broader definition. In *Stack v. Boyle*, the Court described a statutory "right to bail" as the "traditional right to freedom before conviction," and "[t]he right to release before trial . . . conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." 342 U.S. 1, 4 (1951). The early practice of bail was the "securing [of] oaths of responsible persons to stand as sureties for the accused," whereas the practice in the 1950s was "requiring a bail bond

or a deposit of a sum of money subject to forfeiture [to] serve[] as additional assurance of the presence of an accused." *Id.* at 5. Bail is a "conditional privilege" that enables accused persons "to stay out of jail until a trial has found them guilty." *Id.* at 8 (Jackson, J., concurring).

In *United States v. Salerno*, the Supreme Court addressed a constitutional challenge to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3150, contending that it violates the Excessive Bail Clause because it allows a court to set bail and order detention for reasons not related to risk of flight. 481 U.S. 739, 752–53 (1987). The Court held the Act did not violate the Eighth Amendment because "[t]he only arguable substantive limitation of the [Excessive] Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil." *Id.* at 754. The Court's reasoning treats "bail" not narrowly, but broadly as "release before trial . . . conditioned upon the accused's giving adequate assurance[s]." *Stack*, 342 U.S. at 4. (Similarly, we have previously described bail as reconciling "pretrial liberty with the need to assure the defendant's presence at trial," *Sistrunk*, 646 F.2d at 68, and the Excessive Bail Clause as "applicable solely to . . . conditions of release or detention designed to assure a criminal defendant's appearance at trial . . . ," *Perry*, 788 F.2d at 112.)

With this understanding, we consider Holland's argument that the Reform Act violates the Eighth Amendment because it bars a New Jersey court from considering or offering criminal defendants monetary bail alongside restrictive conditions such as home detention and electronic monitoring. Under an original meaning, even assuming there is a "right to bail," we have already noted it did not contemplate monetary bail as Holland describes it, *i.e.*, cash bail or corporate surety bond. Neither does a

28

contemporary definition of bail mean exclusively monetary bail; non-monetary conditions of release are also "bail."

Holland further argues that, under a broad definition of "bail," the Reform Act would violate the Eighth Amendment by subjecting defendants to home detention and electronic monitoring "when monetary bail would suffice." Appellants' Br. at 39 n.1. In effect, he asserts the Eighth Amendment's prohibition of excessive bail is violated when there is a less restrictive alternative to the conditions of release ordered by a court. But that is not the test articulated by *Salerno*; for those conditions, however restrictive, to violate the Eighth Amendment, they must be "excessive in light of the perceived evil." *Salerno*, 481 U.S. at 754 (quotation marks omitted); *see also United States v. Gardner*, 523 F. Supp. 2d 1025, 1031 (N.D. Cal. 2007). Holland's release conditions are hardly excessive in light of the State's legitimate interest in addressing his risk of flight and risk of danger to others; the existence of a purportedly less restrictive means does not bear on whether the conditions are excessive.

Holland also claims the Reform Act violates the Excessive Bail Clause because it imposes severe restrictions on "all defendants[']" pretrial liberty except those who can be released on their own recognizance.[8] Appellants' Br. at 36. This statement and Holland's claim that the Reform Act "authoriz[es] severe liberty restrictions of *non-dangerous*

---

[8] Holland further argues on appeal that the Reform Act imposes severe restrictions on all defendants without any heightened showing of dangerousness, thus violating the Excessive Bail Clause. Whether a heightened showing ought to be required is not properly before us because it was not raised in the District Court. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

defendants" misconstrue the Act's statutory requirements. *Id.* at 38 (emphasis in original). The conditions of release imposed on Holland may only be applied if they are the "least restrictive . . . conditions that the court determines will reasonably assure [his] appearance in court when required [and] the protection of the safety of any other person or the community . . . ." N.J. Stat. Ann. § 2A:162–16(b)(2)(b). In practice this has resulted in pretrial monitoring level 3+ home detention and electronic monitoring being ordered for 8.3% of eligible defendants, far from "all defendants." And if a court sought to impose home detention and electronic monitoring on a non-dangerous defendant who presents little risk of flight, it would have to contend with the Act's command that only the least restrictive conditions reasonably assuring the Act's goals may be imposed. If those conditions were excessive in light of the State's legitimate interests, it would also come up against the Eighth Amendment's proscription of excessive bail. This hypothetical scenario, we point out, does not concern Holland, who has not challenged his classification as a potentially dangerous defendant.

Finally, though he waived his statutory right to a pretrial detention hearing, Holland still has an opportunity to argue for a change in his release conditions and potentially request that monetary bail be set. This requires a material change in circumstances justifying a modification. N.J. Ct. R. 3:26–2(c)(2).

In this context, Holland has not demonstrated a likelihood of success on the merits of his argument that the Excessive Bail Clause guarantees a right to monetary bail. Regardless whether the Clause incorporates a right to bail, the latter is not limited to cash bail or corporate surety bonds; it is, to repeat, "release before trial . . . conditioned upon the accused's giving adequate assurance[s]." *Stack*, 342 U.S. at 4. The Clause does not dictate whether those assurances must be

based on monetary or non-monetary conditions. Hence the Eighth Amendment does not require a New Jersey court to consider monetary bail with the same priority as non-monetary bail for a criminal defendant.

## B.     Fourteenth Amendment

The Fourteenth Amendment of the Constitution forbids states from depriving "any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV. This provision contains both substantive and procedural components. *Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017). Holland claims the Reform Act's subordination of monetary bail violates both.

### 1.     Substantive Due Process

Substantive due process "limits what [the] government may do regardless of the fairness of [the] procedures that it employs," *id.* at 501 (citation omitted), to "guarantee protect[ion] against government power arbitrarily and oppressively exercised," *id.* (alteration in original) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). To show a violation, Holland must first demonstrate that he has "been deprived of a particular interest that is protected by . . . substantive due process." *Id.* (citation omitted) (quotation marks omitted). This requires "a careful description of the asserted fundamental liberty interest . . . ; vague generalities . . . will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003) (quotation marks omitted); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).[9]

---

[9] The State argues we should not engage in a substantive due process analysis because Holland's claim is covered by the Eighth Amendment and/or the Fourth Amendment. For the

For a putative right to be "fundamental" under the Due Process Clause, it must be "deeply rooted in this Nation's history and tradition," *Lutz v. City of York, Pa.*, 899 F.2d 255, 267 (3d Cir. 1990) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)), or "implicit in the concept of ordered liberty," *id.* (citation omitted); *see also Glucksberg*, 521 U.S. at 720–21. Both the Supreme Court and our Court have repeatedly warned that we cannot read these phrases too broadly to expand the concept of substantive due process, as "guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). A court "is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Lutz*, 899 F.2d at 267 (citation omitted).

If the right is fundamental, its infringement must be "narrowly tailored to serve a compelling state interest." *Chavez*, 538 U.S. at 775; *see also Glucksberg*, 521 U.S. at 721 (citation omitted). But where fundamental rights or interests are not implicated or infringed, we typically require only a "legitimate state interest that the legislature could rationally conclude was served by the statute." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (citation omitted).

We have previously held substantive due process protects freedom "from government custody, detention, or other forms of physical restraint prior to any determination of

reasons contained in this opinion, those constitutional provisions do not protect Holland's claim, and thus we proceed to our analysis of substantive due process. *See Lewis*, 523 U.S. at 843.

32

guilt." *Steele*, 855 F.3d at 502 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)) (quotation marks omitted); *see also Perry*, 788 F.2d at 112 ("[T]here is a substantive liberty interest in freedom from confinement."). Nevertheless, "an arrestee's right to freedom from pretrial detention is subordinated . . . where there has been an adjudication that detention is necessary because an arrestee presents an identified and articulable threat to an individual or the community . . . or to ensure [his or her] presence at trial . . . ." *Steele*, 855 F.3d at 502 (quoting *Salerno*, 481 U.S. at 750–51, and *Bell v. Wolfish*, 441 U.S. 520, 523 (1979)) (quotation marks omitted); *see also Perry*, 788 F.2d at 113 ("[A] demonstration of dangerousness justifies deprivation of liberty by civil commitment without offending the substantive due process limitation upon government.").

Holland, however, claims substantive due process protects his right to have the option to deposit money or obtain a corporate surety bond to secure his future appearance before he may be subjected to "severe deprivations of pretrial liberty." So "[w]e begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices." *Glucksberg*, 521 U.S. at 710.

Holland has not pointed us to any evidence of cash bail or corporate surety bonds in early bail practice in the United States, nor did our search reveal any. Rather, both modern forms of bail appear to have emerged in the mid-to-late Nineteenth Century, largely as a product of the expansive frontier and urban areas in America diluting the personal relationships necessary for a personal surety system. Comment, *Bail: An Ancient Practice Reexamined*, 70 Yale L.J. 966, 967–68 (1961); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 749 (1996). With respect to cash bail, some jurisdictions deemed

the practice illegal because it would not secure the government's interest in the accused appearing at trial.[10] But by the Twentieth Century many jurisdictions (even if not yet states) enacted statutes to allow it in certain circumstances,[11]

---

[10] *Butler v. Foster*, 14 Ala. 323, 325–26 (1848); *United States v. Faw*, 1 Cranch C.C. 486, 486 (D.C. Cir. 1808); *Smart v. Cason*, 50 Ill. 195, 197 (1869); *State v. Reiss*, 12 La. Ann. 166, 166–67 (1857) ("There is no law which authorizes a Sheriff to receive money as a security for the appearance of persons accused of crime. Where parties are admitted to bail under bonds and recognizances, they are not absolutely discharged, but are (as it were) transferred from the custody of the Sheriff to the friendly custody of the sureties in the bond or recognizance."); *People v. Rutan*, 3 Mich. 42, 50–51 (1853); *Reinhard v. Columbus*, 31 N.E. 35, 38 (Ohio 1892).

[11] Alaska Crim. Proc. Code ch. 23, § 229 (1900) (adopting law of Oregon); Ariz. Rev. Stat. tit. 12, ch. 5, § 1981 (1887); Ark. Code Prac. Civ. & Crim. Cases tit. 5, ch. 3, § 84 (1869); Cal. Crim. Proc. Code ch. 119, pt. 4, tit. 3, ch. 7, § 151 (1850); Ind. Rev. Stat. ch. 4, art. 9, § 1706 (1881); Iowa Code pt. 4, tit. 25, ch. 196, § 3232 (1851); Kan. Stat. ch. 82, art. 9, § 145 (1868); Ky. Crim. Code tit. 5, ch. 3, § 84 (1867); Mass. Gen. Laws pt. 4, tit. 2, ch. 212, § 68 (1882); Mont. Rev. Stat. div. 3, ch. 11, § 249 (1879); Nev. Rev. Stat. ch. 53, tit. 4, pt. 10, § 2141 (1873); 1898 N.J. Laws 875; N.Y. Crim. Proc. Code pt. 4, tit. 11, ch, 1, art. 5, § 648 (1850); N.D. Rev. Crim. Proc. Code ch. 6, art. 5, § 7856 (1895); Okla. Stat. ch. 72, art. 5, § 67 (1890); Or. Crim. Code tit. 1, ch. 25, § 1483 (1887); Tenn. Code pt. 4, tit. 4, ch. 10, art. 4, § 5167 (1857); Utah Code Ann. tit. 76, ch. 16, § 4662 (1898); Wash. Rev. Code ch. 83, § 1036 (1881); Wisc. Stat. tit. 33, ch. 195, § 4816

and others followed in the early and mid-Twentieth Century (including some jurisdictions that had previously barred it).[12]

(1898); *Cressey v. Gierman*, 7 Minn. 398, 404 (1862) (citing state statute that permits defendants to deposit money in lieu of bail); *Raisin Fertilizer Co. v. Grubbs*, 19 S.E. 597, 597 (N.C. 1894) (same).

[12] D.C. Code ch. 20, § 938 (1906); Idaho Penal Code tit. 23, ch. 235, § 5647 (1901); 37 Ill. Comp. Stat. ¶ 3363 (1920); La. Code Crim. Proc. Ann. art. 97 (1929); 1919 Mich. Pub. Acts 332 (1919); S.D. Codified Laws tit. 11, ch. 11, § 590 (1903); *Holcombe v. Pierce*, 43 So. 2d 640, 642–43 (Ala. 1949) (noting 1949 Act amended Alabama Code to permit cash bail); *Puchuneicz v. Chellis*, 27 Ohio N.P. (n.s.) 494, 495 (1929) (noting Chapter 14, Section 8 of new criminal code allows for deposit of cash in lieu of recognizance); *State ex rel. City of Beckley v. Roberts*, 40 S.E.2d 841, 845 (W. Va. 1946) (noting 1943 Act authorized cash bail). *Compare* Conn. Gen. Stat. tit. 20, ch. 13, pt. 3, § 1 (1875), *with* 1909 Conn. Pub. Acts ch. 72 (1909). *Compare* Fla Laws div. 5, pt. 2, tit. 2, ch. 1, art. 2, § 3926 (1906), *with* Fla. Laws div. 5, pt. 2, tit. 2, ch. 1, art. 2, § 3936a (1914). *Compare* Maine Rev. Stat. Ann. tit. 11, ch. 135, § 6 (1916), *with* Maine Rev. Stat. Ann. tit. 11, ch. 145, § 28 (1930). *Compare* R.I. Gen. Laws tit. 37, ch. 354, § 15 (1909), *with* R.I. Gen. Laws tit. 40, ch. 407, § 6323 (1923). *Compare* S.C. Crim. Code tit. 1, ch. 2, § 28 (1902), *with* S.C. Crim. Code tit. 1, ch. 2, § 37 (1912). *Compare* Va. Code. tit. 41, ch. 198, § 4972 (1918), *with* Va. Code tit. 41, ch. 198, § 4973a (1924). *Compare* Wyo. Stat. Ann. div. 5, tit. 2, ch. 2, § 5182 (1899), *with* Wyo. Stat. Ann. ch. 397, § 6087 (1910). *Compare Commonwealth v. Fortini*, 27 Pa. D. 521, 522 (1918) ("[W]e have no statute in

Outside the statutes' circumscribed scope, however, numerous jurisdictions made clear that cash bail was not available in common law as an alternative to obtaining a personal surety.[13] Even through the 1950s a few jurisdictions had no statutory provision for cash bail, and we see no

---

Pennsylvania that permits cash bail."), *with* 1919 Pa. Laws 102, § 2 (1919). Cash bail also became an option in Maryland and New Hampshire, but it is unclear whether its basis was statutory. *Outerbridge Horsey Co. v. Martin*, 120 A. 235, 235–36 (Md. 1923); *Rockingham Cty. v. Chase*, 71 A. 634, 635 (N.H. 1908). The same was true for the then-Territory of Hawaii. *See Territory v. Ah Sing*, 18 Haw. 470, 471 (1907).

[13] *Paton v. Teeter*, 37 Cal. App. 2d 477, 479 (Dist. Ct. App. 1940) (holding cash bail may not be accepted in place of a surety absent a statutory provision authorizing such acceptance); *Palakiko v. Cty. of Maui*, 22 Haw. 759, 760 (1915) (same); *State v. Owens*, 84 N.W. 529, 530 (Iowa 1900) (same); *Applegate v. Young*, 61 P. 402, 402 (Kan. 1900) (same); *Badolato v. Molinari*, 174 N.Y.S. 512, 514 (Crim. Ct. 1919) (same); *Exchange Trust Co. v. Mann*, 269 P. 275, 276 (Okla. 1928) (same); *Brasfield v. Town of Milan*, 155 S.W. 926, 927 (Tenn. 1913) (same); *Kellogg v. Witte*, 182 P. 570, 571 (Wash. 1919) (same). *But see Rowan v. Randolph*, 268 F. 529, 530 (7th Cir. 1920) (holding a judge does not have the discretion to refuse to accept cash bail and require a surety in common law "where the penalty of the bond is payable in money" and the amount of the penalty was tendered upfront as security).

evidence its practice was accepted based on prior decisions not overturned.[14]

Rather than a product of statute, by contrast it appears commercial bail bonding was a product of economic opportunity presented by the eroding personal surety system. The first bail bond business in the United States is widely thought to have formed in 1898 in San Francisco. *The Old Lady Moves On*, Time Mag., Aug. 18, 1941. By 1912 the Supreme Court recognized the permissibility of commercial contracts for bail bonds. *Leary v. United States*, 224 U.S. 567, 575 (1912). But widespread criticism of the practice, leading to reform, shortly followed. A landmark study on the bail system in Chicago in the 1920s described rampant abuses in

---

[14] *Lowrie v. Harvey*, 10 P.2d 335, 335–36 (Colo. 1932) (noting no statutory provision for the acceptance of cash or its equivalent in lieu of bond); *Scarboro v. State*, 62 S.E.2d 168, 170 (Ga. 1950) ("Indeed, even judicial or other officers who are empowered to admit persons accused of crime to bail[] have no right, in the absence of express statutory authority, to accept a deposit of money in lieu of bail or as a substitute for a recognizance, and the release upon the making of such a deposit, of a person held in custody under a criminal charge is illegal.") (citation omitted); *Cooper v. Rivers*, 48 So. 1024, 1025 (Miss. 1909) (noting no law authorizing sheriff to take money as a deposit in lieu of bail); *Snyder v. Gross*, 95 N.W. 636, 637 (Neb. 1903) ("[A] deposit of money instead of the usual bail was not authorized."). *Compare* Ga. Code Ann. § 27–418 (1933), *with* Ga. Code Ann. § 17–6–4(a) (1982). *Compare Dufek v. Harrison Cty.*, 289 S.W. 741, 742 (Tex. App. 1926) (noting cash bail not authorized), *with Smith v. Decker*, 312 S.W.2d 632, 634 (Tex. 1958) (noting option to deposit cash in 1957 Act).

professional bail bonding, including bondsmen's failure to pay on forfeited bonds. Arthur L. Beeley, *The Bail System in Chicago* 39–44 (1927). Criticism of reliance on monetary bail, of which commercial bail bonding was a key feature, continued through the 1950s. By that time scholars had criticized the monetary bail system as discriminatory, arbitrary, and ill-suited to ensuring a defendant's appearance in court. *See* Wayne H. Thomas, Jr., *Bail Reform in America* 14–15 (1976). Ultimately, these concerns motivated federal and state governments to reform their bail laws to deprioritize monetary bail (including corporate surety bonds) under non-monetary conditions of release. *See* Bail Reform Act of 1966, Pub. L. No. 89–465, § 2, 80 Stat. 214 (1966); *see also* S. Rep. 98–225, at 5 n.7 (1983); Thomas at 181.

Historical practice informs whether the option to post cash or obtain a corporate surety bond for bail is fundamental. *Cf. Medina v. California*, 505 U.S. 437, 446 (1992). The "settled tradition" of cash bail we see in our nation's history is that it is only available as an alternative to obtaining a personal surety when a statute so permits, and, in the absence of statutory permission, it is generally unavailable. *Id.* Additionally, we see no historical basis for a right to obtain a corporate surety bond, as this relatively modern practice was quickly limited by reform. Nor have we found any historical authority supporting an option to deposit money or obtain a corporate surety bond in lieu of the release conditions to which Holland agreed, namely, home detention and electronic monitoring. In sum, to the extent Holland contends there is a history of a "right to bail," that right does not require cash bail or a corporate surety bond to be available as an alternative equal to other release conditions.

As we discern no historical basis for concluding substantive due process requires criminal defendants to have the option to post cash or obtain a corporate surety bond to

38

ensure their future appearance in court, *id.* at 448, we turn to whether either practice is "implicit in the concept of ordered liberty." *Lutz*, 899 F.2d at 267 (citation omitted). Holland contends bail is fundamental to our scheme of ordered liberty because it ensures freedom before conviction for presumptively innocent defendants who pose little flight risk and no danger, and it enables them to prepare a more complete defense. To be sure, "bail constitutes a fundament of liberty underpinning our criminal proceedings," *Sistrunk*, 646 F.2d at 70, but we cannot say the same of Holland's requested forms of monetary bail.

Reliance on monetary bail, including cash bail and corporate surety bond, through the middle of the Twentieth Century came at a cost: criminal defendants who were unable to post or pay even modest sums to secure their release were kept in jail.

> The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty.

*Stack*, 342 U.S. at 7–8 (Jackson, J., concurring). Monetary bail often deprived presumptively innocent defendants of their pretrial liberty, a result that surely cannot be fundamental to preserving ordered liberty.

As a result, we hold cash bail and corporate surety bond are not protected by substantive due process because they are neither sufficiently rooted historically nor implicit in the concept of ordered liberty. Hence the Reform Act's subordination of monetary bail to non-monetary conditions of

39

release need only be rationally related to a legitimate State interest. And it is—New Jersey's interests in ensuring defendants appear in court, do not endanger the safety of any person or the community, or obstruct their criminal process, are no doubt legitimate. *See Salerno*, 481 U.S. at 750–51; *Bell*, 441 U.S. at 523; *Steele*, 855 F.3d at 502; *Perry*, 788 F.2d at 113. The State's shift away from monetary bail as a primary option was designed to serve those interests: it found the reliance on monetary bail resulted in the release of defendants who had the means to pay regardless of their flight risk or danger, and the pretrial detention of poorer defendants even if they were accused of less serious crimes and posed little risk. JCCJ Report at 1–2. Reliance on non-monetary conditions of release instead of monetary bail thus allows the State to release low-risk defendants, who may be unable to afford to post cash or pay a bondsman, while addressing riskier defendants' potential to flee, endanger the community or another person, or interfere with the judicial process that decrees their guilt or innocence.[15]

## 2. Procedural Due Process

Pretrial release and detention decisions implicate a liberty interest—conditional pretrial liberty—that is entitled

---

[15] Though we do not apply strict scrutiny, it would appear that New Jersey's reliance on non-monetary release conditions is more narrowly tailored than the system in place before the Reform Act. Holland's argument to the contrary—that monetary bail is less restrictive of liberty than non-monetary bail—is belied by the early statistics on the Act. In its first year, New Jersey's pretrial jail population was reduced by 20%, whereas the non-monetary conditions to which Holland agreed were ordered for only 8.3% of eligible defendants.

to procedural due process protections. *See United States v. Delker*, 757 F.2d 1390, 1397 (3d Cir. 1985). But "not every potential loss of liberty requires the full panoply of procedural guarantees available at a criminal trial." *Id.* "[D]ue process is flexible and calls for such procedural protection as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (quotation marks omitted).

Procedural due process requires us to balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The State asserts Holland waived any procedural due process argument because he opted out of the pretrial detention hearing that was available to him. To be sure, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). That did not happen because Holland chose to forgo his right to the available hearing. But, for the sake of completeness, we nonetheless address his process contentions.

41

Holland argues the Reform Act violates procedural due process because it enables the State court to impose on criminal defendants home detention and electronic monitoring without having the option to impose monetary bail together with or in place of these non-monetary conditions. We do not decide whether non-monetary conditions such as home detention and/or electronic monitoring restrict criminal defendants' pretrial liberty. Even assuming these conditions would satisfy the first balancing factor, the other two factors do not point to a violation of Holland's right to procedural due process.

We evaluate the deprivation risk to Holland's pretrial liberty interest by considering "the fairness and reliability of the existing . . . procedures[] and the probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 343. Due to the prosecutor's pretrial detention motion, Holland had access to a pretrial detention hearing to determine whether he would be detained pretrial and, if not, what conditions of release would be imposed on him. The questions Holland poses are, first, whether the procedural protections supplied to him in this hearing were adequate given the Reform Act's restrictions on a State court's ability to set monetary bail, and, second, whether procedural due process requires the court to consider monetary bail in line with non-monetary conditions.

We briefly restate the Reform Act's existing procedures that applied to Holland had he taken advantage of them. Before the prosecutor brought a pretrial detention motion, Pretrial Services prepared a Public Safety Assessment and recommendation for release conditions that flagged him as a risk to commit new violent criminal activity. It recommended that he be detained pretrial. Following Pretrial Services' recommendation, the prosecutor moved for pretrial detention; hence Holland was entitled under the

Reform Act to a pretrial detention hearing. At the hearing he had the right to counsel or to have counsel appointed, the opportunity to testify, present witnesses, cross-examine witnesses, and present information. N.J. Stat. Ann. § 2A:162–19(e)(1). He was also able to subpoena and call the State's witnesses. ACLU Pretrial Justice Manual at 42. Further, rules concerning the admissibility of evidence in criminal trials did not apply to this hearing, N.J. Stat. Ann. § 2A:162–19(e)(1), and Holland was entitled to receive significant discovery, including all exculpatory evidence, a copy of the charging documents, all statements and reports that relate to the affidavit of probable cause, plus any additional evidence the prosecutor relied on at the detention hearing to establish probable cause and to support any Public Safety Assessment. N.J. Ct. R. 3:4–2(c)(1); *see also Robinson*, 160 A.3d at 19.

The court could then take into account various factors to determine whether any monetary or non-monetary release conditions, or combination of conditions, would reasonably assure not only Holland's presence at trial but also the other goals of the Act. These factors include: the nature and circumstances of the offense charged; the weight of the evidence against Holland and the admissibility of any evidence sought to be excluded; his history and characteristics; the nature and seriousness of his dangerousness on pretrial release; and Pretrial Services' recommendation of release or detention. N.J. Stat. Ann. § 2A:162–20. If the court then decided against pretrial detention, it could have imposed only the least restrictive non-monetary condition or combination of conditions that would reasonably assure Holland's presence at trial and the safety of the community and other persons, provided release on personal recognizance or an unsecured appearance bond would not reasonably assure those goals. *Id.* §§ 2A:162–16(b)(2), 2A:162–17(a)–(b). Monetary bail, other than unsecured appearance bond, was an option only if non-

43

monetary bail was found inadequate. *Id.* §§ 2A:162–16(b)(2)(c), 2A:162–17(c)(1), (d)(1), 2A:162–18(a)(2).

The Reform Act's applicable procedures mirror those in the federal Bail Reform Act of 1984. In response to a facial challenge that the federal Bail Act failed to satisfy procedural due process before criminal defendants may be detained pretrial, the Supreme Court reviewed the Act's procedures and held the "extensive safeguards suffice to repel a facial challenge." *Salerno*, 481 U.S. at 752. It noted the Bail Act's protections were "more exacting than those . . . found sufficient in the juvenile context, . . . and they far exceed[ed] what [the Court] found necessary to effect limited post[-]arrest detention . . . ." *Id.* (citing *Schall v. Martin*, 467 U.S. 253, 275–81 (1984); *Gerstein*, 420 U.S. 103).

*Salerno* informs our view that the risk of erroneously depriving Holland's pretrial liberty is low under the New Jersey Reform Act's procedures given its subordination of monetary bail. All of the procedures the Court held were "extensive safeguards" under the federal Act are included in the New Jersey Act's pretrial detention hearing. And the New Jersey Act adds the additional protection of extensive discovery.[16] Beyond these extensive safeguards, the Reform Act allows only the least restrictive non-monetary condition, or combination of conditions, reasonably assuring the Act's goals. Considering all the protections available to Holland under the Reform Act, the risk of erroneous deprivation of his

---

[16] Though Holland argues on appeal that procedural due process requires a heightened showing before a State court may order home detention and electronic monitoring, as required for pretrial detention, he did not raise this argument in the District Court, and thus it is not properly before us. *See Hormel*, 312 U.S. at 556.

44

pretrial liberty—ostensibly through the imposition of home detention and electronic monitoring—is low even if the court were unable to consider monetary bail.

The probable value of requiring the court to consider monetary bail in line with home detention and electronic monitoring is also low. Holland contends that monetary bail preserves liberty, whereas home detention and electronic monitoring encumber it. Thus, the argument goes, giving the court the option to release criminal defendants on monetary bail in lieu of home detention and electronic monitoring would necessarily reduce the risk of an erroneous deprivation. His counsel also suggested during oral argument that the court should set monetary bail to account for any flight risk but still have the option to set restrictive non-monetary conditions to account for potential danger. Or. Arg. Tr. at 27.

The first argument is refuted by the actual effect of the Reform Act; the second is hypothetical. New Jersey decided to shift from its prior monetary bail system because it resulted in more criminal defendants being detained in jail pretrial, and "civil detention . . . results in the deprivation of the most fundamental of all personal liberties." *Perry*, 788 F.2d at 113. As noted above, in the year since the Act took effect New Jersey's pretrial jail population was reduced significantly while home detention and/or electronic monitoring was ordered for few eligible defendants. CJR Report 2017, at 4; *see* Initial Release Decisions 2017. Monetary bail, as it existed in New Jersey prior to the Reform Act, resulted in more restrictions of criminal defendants' pretrial liberty, not fewer. Additionally, the notion the court should set monetary bail to account for Holland's flight risk, while also having the ability to set restrictive non-monetary conditions to account for his danger to others, would result in more than the non-monetary bail conditions Holland accepted. Perhaps what he proposes is that using monetary bail to mitigate flight would

45

reduce the restrictiveness of the non-monetary conditions the court sets, thus reducing the risk of erroneous deprivation of liberty. If so, he provides no support for this hypothetical outcome.

The final *Mathews* factor, the State's interest, also indicates the Reform Act's procedures, which subordinate monetary bail to non-monetary conditions of release, do not violate procedural due process. This factor includes the public interest, "the administrative burden and other societal costs that would be associated with [the additional] requir[ement]" along with financial costs to the State. *Mathews*, 424 U.S. at 347. The Reform Act's goals include not only the reasonable assurance of eligible defendants' appearance at trial, but also the safety of the community and other persons, and the integrity of the criminal justice process. Holland does not contest that monetary bail fails to address his risk of danger. Thus the State's strong and legitimate interest is not served by placing consideration of monetary bail in line with conditions designed to mitigate danger to other persons and the community. Moreover, the public interest also includes, broadly, pretrial liberty. As explained above, studies have revealed reliance on monetary bail results in greater encumbrance of pretrial liberty, as many pretrial detainees are kept in custody because of their inability to post even modest monetary bail. And the Reform Act has thus far been effective in reducing the pretrial detention population. Even if home detention and electronic monitoring may be considered restrictions on pretrial liberty, they may only be imposed if they are the least restrictive conditions that reasonably assure the Reform Act's goals. Also of marginal note is the administrative burden of imposing an additional procedural requirement. The State posits that the burden of requiring the court to consider monetary bail in line with non-monetary conditions would include retraining court personnel, prosecutors, public defenders, and private defense attorneys,

46

and promulgating one or more new court rules, which would be financially and human-resource intensive. In any event, the State's interest weighs against finding a violation of procedural due process.

Though we reach no holding on whether home detention and electronic monitoring impinge Holland's pretrial liberty, we assume they do. Even so, we hold the lower priority of monetary bail to non-monetary bail conditions does not make constitutionally inadequate the extensive safeguards available to Holland under the Reform Act. Those procedures—together with the low probable value of requiring the court to consider monetary bail alongside home detention and electronic monitoring, and the State's interest—indicate the subordination of monetary bail does not violate procedural due process, especially when Holland retains the option of seeking a modification of his bail conditions should circumstances change.

\* \* \* \* \*

In sum, we hold the Reform Act's subordination of monetary bail to non-monetary bail conditions does not violate either component of the Due Process Clause. Substantive due process does not provide a right to monetary bail. It is neither historically rooted to the time of our Bill of Rights nor implicit in the concept of ordered liberty, and the Reform Act's subordination of it to non-monetary release conditions is rationally related to the State's legitimate interests in assuring defendants appear at trial, the safety of the community and other persons, and the integrity of the criminal justice process. As for procedural due process, the extensive safeguards provided by the Reform Act are not made inadequate by its subordination of monetary bail. Moreover, Holland still may move the State court to modify his bail based on a change of circumstances, wherein he may

be able to argue he no longer presents a danger and thus the conditions of release imposed on him should be less restrictive. *See* N.J. Ct. R. 3:26–2(c)(2).

### C.     Fourth Amendment

Unlike his Eighth Amendment and Due Process arguments, Holland does not argue the Fourth Amendment provides a right to monetary bail. Rather, he asserts the Reform Act violates the Fourth Amendment's prohibition of "unreasonable searches and seizures" because the conditions to which he agreed, *i.e.*, home detention and electronic monitoring, are "unreasonable" inasmuch as they involve significant intrusions on his privacy and are not needed to promote the State's legitimate interest when monetary bail would serve the same interest less intrusively.[17]

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. It is binding on the states by the Fourteenth Amendment. *Maryland v. King*, 569 U.S. 435, 446 (2013). But not all

---

[17] Holland cursorily contends his release conditions were not based on reasonable suspicion or probable cause that he will commit a crime, but makes no argument to support this claim. Thus we do not address it on appeal. *See Free Speech Coalition, Inc. v. Att'y Gen.*, 677 F.3d 519, 545 (3d Cir. 2012). We also refrain from considering his argument that the State's interest in home detention and electronic monitoring is unreasonable absent a heightened showing of dangerousness because it was not raised to the District Court. *Hormel*, 312 U.S. at 556.

48

searches and seizures run afoul of it. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). To determine whether a seizure is reasonable, we examine the totality of circumstances and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Schneyder v. Smith*, 653 F.3d 313, 325 (3d Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal citation omitted)). Likewise, to assess whether a search is reasonable, we balance "the degree to which [it] intrudes upon an individual's privacy and, on the other hand, the degree to which [it] is needed for the promotion of legitimate governmental interests." *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005) (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)).

We do not accept as given that placing an electronic monitor on an individual and then tracking his whereabouts always constitute a search and seizure, and that home detention is a seizure. In *Grady v. North Carolina*, 135 S. Ct. 1368 (2015), the Supreme Court held that "a State . . . conducts a search when it attaches a device to a person's body, *without consent*, for the purpose of tracking that individual's movements." *Id.* at 1370 (emphasis added). Holland does not challenge on appeal the District Court's finding that he consented to the conditions imposed on him. We are aware of no binding authority that holds consented-to tracking and consented-to home detention are a search and a seizure.

Even assuming they are, we cannot estimate the extent to which they intrude on Holland's privacy. Holland alleges the ankle bracelet he wears for monitoring purposes requires him to stay near a power outlet for several hours a day while the device charges, precludes him from traveling on a

49

commercial airplane, and discloses "a massive amount of private information about [his] life to the state." Appellants' Br. at 50. But the District Court did not find any facts that support an intrusion on privacy; rather, it assumed these practices are intrusive. We too assume without deciding they are at least somewhat intrusive.

That intrusiveness, however, is lessened by Holland's reduced expectation of privacy. "Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, . . . his or her expectations of privacy and freedom from police scrutiny are reduced." *King*, 569 U.S. at 463. Holland does not challenge that he was arrested on probable cause for a dangerous offense, and thus we consider his expectation of privacy to be reduced.

Against Holland's reduced privacy interest we balance the State's interest. The Supreme Court has held "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials" and a "legitimate and compelling" interest in preventing crime by arrestees. *Id.* at 452–53 (citations omitted). These mirror the goals espoused by the State in the Reform Act, and Holland does not challenge the legitimacy of them. Rather, he argues the conditions are not reasonable because monetary bail could serve the same legitimate interests in a less intrusive manner. We repeat the State found monetary bail did not adequately address flight risk and could not, by its nature, address risk of danger.

In any event, Holland's argument fails as a matter of law because the Supreme Court "has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means . . . ." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawotomie Cty. v. Earls*, 536 U.S. 822, 837 (2002); *see also Illinois v. Lafayette*, 462 U.S.

50

640, 647 (1983). The existence of a less intrusive means does not itself render a search or seizure unreasonable. Whether the conditions to which Holland agreed are in themselves unreasonable, regardless of the availability or unavailability of monetary bail, is beyond the scope of our inquiry and in any event can be revisited if circumstances change.

We hold Holland is unlikely to succeed on the merits of his argument that the Reform Act violates the Fourth Amendment because monetary bail could serve the same legitimate government interest in a less intrusive manner than the conditions to which he agreed. The Supreme Court has repeatedly disavowed a "less intrusive means" standard for determinations of reasonableness under the Fourth Amendment, *see Lafayette*, 462 U.S. at 647, and we will not adopt one here.

## V. Conclusion

Holland has standing to bring his claims that the Reform Act violates the Eighth, Fourteenth, and Fourth Amendments of the United States Constitution, but Lexington does not. He has not, however, made a threshold showing of the first two factors required to prevail on a motion for a preliminary injunction. He has not demonstrated a sufficient likelihood of success on the merits of his argument that the Reform Act violates a constitutional right to cash bail or corporate surety bonds. We find no right to these forms of monetary bail in the Eighth Amendment's proscription of excessive bail nor in the Fourteenth Amendment's substantive and procedural due process components. We also reject Holland's "less intrusive means" theory of a Fourth Amendment violation, and so we hold he has not made a sufficient showing of a violation of that constitutional amendment. Without a constitutional right violated, and with reconsideration of current release conditions an option if

51

circumstances suggest and a request made, irreparable harm does not exist. Thus we affirm the District Court's denial of Holland's motion for a preliminary injunction.